UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

PHILIP KAMINSKY,

    Plaintiff,

     v.                                    Civil Action No.

OAK POINT ASSOCIATES,

    Defendant.

**COMPLAINT**
**JURY TRIAL REQUESTED**
**INJUNCTIVE RELIEF REQUESTED**

NOW COMES the Plaintiff, Philip Kaminsky ("Plaintiff" or "Kaminsky"), by and through undersigned counsel, and complains against the Defendant, Oak Point Associates ("Defendant" or "Oak Point Associates"), as follows:

JURISDICATION AND PARTIES

1.     This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. § 4551 *et seq.*; the Maine Whistleblowers' Protection Act ("MWPA"), 26 M.R.S. §§ 831 *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*; and the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*

2.     Kaminsky is a United States citizen who resides in Cape Elizabeth, Maine.

3.     Defendant is a Maine corporation located in Biddeford, Maine.

4.     Defendant had 20 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

1

5.      On October 15, 2014, Kaminsky filed a timely Complaint/Charge of Discrimination against the Defendant with the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC").

6.      On or about May 8, 2015, the MHRC issued a Notice of Right to Sue with respect to Kaminsky's state law claims. On or about April 27, 2015, the EEOC issued a Notice of Right to Sue.

7.      Kaminsky has exhausted his administrative remedies with respect to all claims set forth in this Complaint.

8.      The majority of the discriminatory practices alleged herein were committed within the State of Maine, primarily in York County.

9.      This Court has subject matter jurisdiction over Kaminsky's federal and state claims pursuant to 28 U.S.C. §§ 1331and 1367.

10.     This action properly lies in the District of Maine pursuant to 28 U.S.C. § 1391(b) because the claims arose in this judicial district.

11.     At all material times, Defendant was Plaintiff's employer within the meaning of the MHRA, MWPA, ADEA, ADA, and FCA.

<u>JURY TRIAL DEMAND</u>

12.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues triable of right by jury.

<u>FACTUAL ALLEGATIONS</u>

13.     Kaminsky is a Licensed Architect with over 40 years of experience in design and project management of a wide variety of projects including educational, institutional, commercial, and public safety.

14.     Kaminsky is certified by the National Council of Architectural Registration Boards, a nonprofit corporation comprising the legally constituted architectural registration boards of the 50 states, the District of Columbia and three U.S. territories (Guam, Puerto Rico, and the U.S. Virgin Islands).

15.     Kaminsky was employed by Defendant as an Architect and Urban Designer beginning in October 2005.

16.     Kaminsky became a full time employee on January 1, 2006 and remained employed until May 14, 2014 when he was involuntarily terminated.

17.     Defendant is a design studio-based practice that combines in-house architectural design and engineering disciplines with locations in Portsmouth, NH and Biddeford, ME.

18.     Rob Tillotson is the owner and President.

19.     During Kaminsky's time as an employee with Defendant he was often called upon by Tillotson and employees at the firm to troubleshoot issues and perform quality control reviews on projects and to take over the project lead and turn around complex projects and projects where the firm was having difficulties.

20.     During Kaminsky's time as an employee with Defendant he also played a large role in winning projects for the firm and in particular played a large role in winning a number of federal General Services Administration ("GSA") and institutional  projects in Maine and in other states.

21.     Kaminsky was 68 years old in May 2014.

22.     Kaminsky was diagnosed with vocal cord cancer on December 13, 2013.

23.     Kaminsky had a surgical biopsy in December 27, 2013 that confirmed the diagnosis.

3

24.     Kaminsky used one week of accrued vacation and holiday time during the week of December 31, 2013 to heal from the surgical biopsy.

25.     At the time of his diagnosis, Kaminsky informed Tillotson that he had cancer and that he needed follow up surgery at the end of January 2014.

26.     Kaminsky also let Tillotson know that a third surgery might be necessary after that.

27.     Kaminsky continued to provide Tillotson with updates regarding his cancer and treatment during the remainder of Kaminsky's employment including a number of email updates during this period.

28.     After learning about Kaminsky's cancer and need for surgery Tillotson began to treat him differently and worse.

29.     The number of projects that Tillotson assigned to Kaminsky decreased dramatically immediately following Kaminsky's disclosure of his cancer.

30.     The number of hours per week of work for projects that Tillotson assigned to Kaminsky had consistently met or exceeded forty hours per week from the time that Kaminsky was hired by Defendant in 2005 until Kaminsky disclosed his cancer to Tillotson.

31.     Immediately following Kaminsky's disclosure of his cancer to Tillotson the number of hours per week of work for projects that Tillotson assigned to Kaminsky decreased below forty hours per week and continued to decrease until Kaminsky's termination.

32.     Tillotson began assigning more projects and work to other less-qualified employees.

33.     As a result, these other employees had difficulty keeping up with their work and were encountering issues that they were unable to address due to the fact that they had less experience than Kaminsky.

34.     As a result, during the period from when Kaminsky disclosed his cancer to Tillotson until his termination, other employees consistently sought Kaminsky's assistance and advice with regard to projects.

35.      Despite the fact that Tillotson was not assigning Kaminsky work he continued to stay busy by providing the assistance sought by other employees and continuing to work on projects and quality control assignments that had been assigned to him before he disclosed his cancer.

36.     There was still plenty of work to be done during the period after Kaminsky disclosed his cancer and before his termination and plenty of work to keep Kaminsky busy.

37.     During the period leading up to and following Kaminsky's termination, Defendant continued to bring in new business including a number of large scale projects.

38.     By way of example, Defendant won a ten million dollar Navy contract to design and engineer improvements to the Portsmouth Naval Shipyard ("PNS") and other Navy facilities in 2014.

39.     During staff meetings held in the months leading up to Kaminsky's termination, all project managers with the exception of Kaminsky reported that they were too busy with work already assigned to take on other projects.

40.     Most of one of Kaminsky's vocal cords, with the exception of the tendons, was removed during a second surgery on January 31, 2014.

41.     As a result, Kaminsky was unable to speak at a normal volume without the use of a voice amplification device following the surgery.

42.     After his second surgery he used 22 ¼ hours of vacation time and 13 ½ hours of personal sick time for recovery and continued to work on projects remotely using his laptop, email and the internet.

43.     In March 2014, Defendant was awarded a contract to design a new academic building for the York County Community College.

44.     At about 4:50 PM on March 12, 2014, between his second and third surgery, Tillotson approached Kaminsky at his work station in an open area on the third floor of the Biddeford studio.

45.     Tillotson demeaned and degraded Kaminsky by discussing his employment in the open instead of a closed office.

46.     Tillotson made false accusations against Kaminsky and removed him as project manager and architect for a project building a new security entrance for the GSA O'Neill federal building.

47.     Tillotson accused Kaminsky of submitting a bid that included fees and expenses that exceeded 10%, even though he had never relayed to Kaminsky that he did not want to see more than a 10% fee submitted.

48.     Another employee, Lynn Lamontagne, was the one who finalized and submitted the bid.

49.     Tillotson criticized Kaminsky about a letter that he said he received from the GSA in connection with the fee bid, but would not share the contents of the letter with Kaminsky.

50.     Kaminsky explained to Tillotson that the company was awarded the GSA O'Neill security entrance job anyway and that the fee bid letter that was over 10% had been drafted by Lamontagne, not him.

51.     In spite of his excellent record working on GSA projects, Tillotson told Kaminsky that he wanted Kaminsky off the GSA O'Neill security entrance project and was giving it to Ken Weston to run instead.

52.     Tillotson admitted that GSA did not express any displeasure with Kaminsky or his work.

53.     Tillotson said that it was his "feeling of the situation" that led him to remove Kaminsky from the project.

54.     Tillotson also said that he felt that Kaminsky had factored too much time for meetings on the GSA O'Neill security entrance project and that he "wanted the project done simply without spending much time and making money."

55.     Kaminsky told Tillotson that he had the most knowledge and experience with the GSA O'Neill federal building projects and that he was the right project manager/architect for the job but that it was Tillotson's company and he could make any choice he wished.

56.     Tillotson told Kaminsky that he would be a "senior advisor" for Weston and the team that ran the project.

57.     After the March 12, 2014 meeting, Kaminsky kept Tillotson up to date on his work assignments and let Tillotson know that he had the capacity to do additional projects.

58.     Kaminsky had a third surgery on March 27, 2014 to re-biopsy and re-laser tissues.

59.     Kaminsky took sick time on March 27th and March 28th for his third surgery and was back to work by April 1st.

60.     Tillotson held a high number of scheduling meetings in the months leading up to Kaminsky's termination to try and coordinate staffing on the significant number of current and new projects.

61.     During an April 12, 2014 scheduling meeting, Peter Dunn, a project manager employed by Defendant, indicated that he needed project managers and architects for a number of projects at the PNS and sought guidance from Tillotson regarding who he wanted to use to staff these projects.

62.     Kaminsky was present at the scheduling meeting and indicated at the meeting that he was available to work on these projects.

63.     Kaminsky was not assigned as project manager or architect for any of these new projects.

64.     During a May 5, 2014 scheduling meeting, Tillotson told the employees attending the meeting, which included Kaminsky, that "we are busier than we have ever been with real work so look at making the best use of everyone's time."

65.     In its March 19, 2015 letter to the Maine Human Rights Commission, Defendant claims that Tillotson made an effort to find work for Kaminsky during this time.

66.     This claim is false.

67.     Tillotson never even responded to Kaminsky's emails requesting assignment of additional work.

68.     Kaminsky consistently looked for potential work for Defendant and was often called on by Defendant to bring in high profile national design teams as partners on potential projects.

69.     Kaminsky's use of his contacts with these partners assisted Defendant in getting interviews with potential clients.

70.     In its March 19, 2015 letter to the Maine Human Rights Commission, Defendant alleges that in the months leading up to Kaminsky's termination, Tillotson requested that Kaminsky reach out to his contacts and try and find additional projects and work for Defendant.

71.     This is false.  In fact, Kaminsky proposed to Tillotson that Kaminsky make efforts to procure additional work for Defendant.

72.     Kaminsky provided Tillotson with a plan for seeking out municipal projects with a focus on Justice and Public Safety projects.  Kaminsky explained that in his experience the best way to get this type of work is to go out and meet public sector managers in their towns.

73.     Tillotson denied Kaminsky's request to perform this marketing work and said to Kaminsky, "I don't pay people to do marketing, it takes away from productive time on jobs, I don't pay overtime for marketing."

74.     When Kaminsky had free time he spent it marketing by telephone and tracking capital budgets posted on line by cities and towns to identify potential projects since Tillotson denied his request to go out and meet potential clients directly.

75.     After March 12, 2014 Kaminsky also informed Tillotson that he would require a fourth surgery in June 2014 but that he and his doctor were optimistic that following that surgery he would eventually regain improved use of his voice and his cancer would be in remission.

76.     On the way to an important joint GSA City of Boston design charrette workshop meeting in Boston that Kaminsky had arranged to include Defendant's firm, Tillotson, with other employees present, mocked Kaminsky's need to use a voice amplification device by calling him

"Madonna", presumably referring to the female pop star and her use of a hands free microphone during performances.

77.     Tillotson made it clear that he felt uncomfortable having Kaminsky participate and present during meetings with clients because of his voice impairment and his need for a voice amplification device.

78.     On May 6, 2014, Kaminsky provided quality control feedback to the project manager, Kenneth Weston, regarding the GSA project that Kaminsky was removed from on March 12, 2014 (O'Neill security entrance job) and which Tillotson had indicated he wanted done "without spending much time and making money."

79.     Kaminsky carbon copied Tillotson on his feedback email.

80.     In the May 6, 2014 email, Kaminsky expressed concerns that Defendant's design and other work on the project was not in compliance with federal building codes, GSA PBS P-100, or in compliance with their obligations as licensed architects to provide clear information concerning code requirements based on the change of use for the O'Neill security entrance job.

81.     One concern Kaminsky had was the decision by Ken Weston to intentionally omit indications of queuing lines (areas where members of the public would wait in line to enter the building) on the drawings and in the early existing facility inspection reports, apparently due to concerns that including the queuing lines on the drawings would create the perception that they would impede egress and indicate continued occupancy of the space.  Continued occupancy of the space would require added egress and ventilation requirements per the code.

82.     Kaminsky was concerned that queuing lines could impede egress and that omitting the queuing lines would mean that persons evaluating the plans for safety and mechanical systems would not have important information about how the queuing lines would

impact the ability of people to exit and evacuate the building and impact the design of systems

for air quality and fire protection and so could mislead the client on the need for additional code

mandated systems or if not addressed in design would potentially create an unhealthy

environmental condition and an unsafe situation at the federal building in the event of an

emergency evacuation.

83.     Each of these code requirements was communicated to Ken Weston and or

Defendant's staff and the GSA before and during Ken Weston's takeover of the project.

84.     Kaminsky also expressed his concerns that some aspects of the design were not in

compliance with GSA PBS P-100.

85.     The GSA requires that all of its building projects comply with the PBS P-100.  On

information and belief all GSA contracts require that projects comply with PBS P-100.

86.     Compliance with GSA PBS P-100 was an express and/or implied material

condition of Defendant's contract with GSA for the project in question.

87.     Compliance with GSA PBS P-100 was a precondition for payment under the

Defendant's contract with the GSA.

88.     Tillotson replied to Kaminsky's May 6, 2014 email on May 7, 2014 instructing

him to "stop sending email diatribes."

89.     Kaminsky was not sending diatribes; he was providing feedback and expressing

concerns about the work on the project including the safety concerns noted above and

Defendant's failure to meet the requirements of its contract with the GSA.

90.     Tillotson also wrote in his email that "you were not removed from the

project…you were not given it."

91.     This is false. Kaminsky assisted Defendant in winning the project and was the project manager until he was removed on March 12, 2014.

92.     Kaminsky performed the duties of project manager for the project in question until removed.

93.     Based on Tillotson's actions, Kaminsky concluded that Tillotson was uncomfortable having Kaminsky interact with clients in light of his vocal impairment and use of an auxiliary device when talking.

94.     Kaminsky concluded that Tillotson was viewing him differently and worse because he was a sixty eight year old person with cancer and that Tillotson was not assigning Kaminsky work because Tillotson wanted to phase Kaminsky out of his job.

95.     At about 4:30 PM on May 14, 2014, Tillotson approached Kaminsky at work and told him "I think it's time for us to part ways, with the work load and your skill level, it's time to go."

96.     The conversation then proceeded as follows:

**Kaminsky:** You mean you want to negotiate an exit strategy? I can have my attorney talk to your attorney so there doesn't have to be animosity between us while they figure it out.

**Tillotson**: No, I want you to go, now. I can lay you off if that helps. I could fire you if it came to that.

**Kaminsky**: What is the reason?

**Tillotson**: I don't need a reason, you're the employee, I don't think you fit in here. We're different, we work differently.

**Kaminsky**: How about a reason in writing?

12

**Tillotson**: No, I just want you to go.

**Kaminsky**: Who is your attorney so I can have my attorney call him?

**Tillotson**: Tom Danylik.

**Kaminsky**: Across the street?

**Tillotson**: Yes.

**Kaminsky**: I'll have my attorney contact him.

**Tillotson**: It doesn't have to be that way. But since that is the way you want to do it I'll escort you out right now.

97.     After some additional discussion about company property and Kaminsky's personal belongings, Kaminsky left the building with Tillotson following him.

98.     Defendant subsequently responded to a request for the reason for Kaminsky's termination in writing with the following:

> [T]he reason for [Kaminsky's] termination were (sic) prompted by his adversarial reaction to a decision initiated by the principal of Oak Point Associates regarding the firm's desire to alter the working relationship with him as a result of a lack of present or foreseeable projects which would require someone within his discipline at his level of expertise and experience on a full time basis.

99.     The reason for termination provided by Defendant's written explanation for the termination is different and inconsistent with the explanation provided by Tillotson on May 14, 2014. The stated and written reasons for Kaminsky's termination are false and pretextual.

100.     Kaminsky was never adversarial.

101.     The only "decision initiated" by Tillotson "to alter the working relationship" with Kaminsky was to terminate Kaminsky's employment.

102.   Tillotson communicated nothing to Kaminsky about laying him off or asking if he was willing or interested in working less than full time.

103.   As of May 14, 2014, there were present and foreseeable projects that required an architect and project manager with Kaminsky's expertise and experience on a full time basis.

104.   On information and belief, since Kaminsky's termination, Defendant has had trouble coordinating many of its projects and providing the level of quality control required by the federal government.

105.   On information and belief, during the period since Kaminsky's termination, Defendant has committed a number of major design errors on projects for the Navy.

106.   One factor undermining Defendant's performance is the fact that the project managers currently employed by Defendant are too busy to spend adequate time on all projects.

107.   Kaminsky was never asked if he would be willing or interested to work less than full time.

108.   In its March 19, 2015 letter to the Maine Human Rights Commission, Defendant alleged the following regarding Kaminsky's termination:

> The firm did not have enough work to keep him full time employed. Before any conversations about adjustments in his work schedule could be had, Mr. Kaminsky asked for the name of [Defendant's] attorney so that Mr. Kaminsky's attorney could contact him. This response both shocked and disturbed Mr. Tillotson, first as being unnecessarily adversarial and secondly, appearing as though Mr. Kaminsky was anticipating some adjustment in his employment status as he had already contacted counsel. As a result of Mr. Kaminsky's statement…Mr. Kaminsky was asked to leave the premises. In short, initially the sole reason for discussion with Mr. Kaminsky about lay off was due to lack of work. His termination was caused by his apparent litigation posture.

14

109.    Defendant's March 19, 2015 rationale for terminating Kaminsky is also false and pretextual as it does not accurately reflect the conversation on May 14, 2014 and because the claim that there was not enough work to keep Kaminsky fully employed is false.

110.    In addition, Defendant's claim that it terminated Kaminsky because he responded to Tillotson's statement about adjusting the working relationship by indicating that he would be involving his attorney is direct evidence of unlawful retaliation.

111.    Tillotson's admission that he viewed this statement by Kaminsky to be "adversarial" and a "litigation posture" and terminated Kaminsky for these reasons constitutes an admission that Defendant terminated Kaminsky for opposing what Kaminsky reasonably believed to be a discriminatory termination.

112.    The projects that were being performed by Kaminsky are now being assigned to younger, non-disabled employees.

113.    The projects that were being performed by Kaminsky are now being assigned to other employees who did not oppose unsafe and unlawful approaches to projects.

114.    The projects that were being performed by Kaminsky are now being assigned to other employees who did not report and oppose violations of Defendant's contract with the GSA.

115.    Tillotson viewed Kaminsky differently and worse because he was 68 years old and because of false perceptions about how his cancer and the temporary impairment to his voice were impacting his job and interactions with clients.

116.    Tillotson was embarrassed by Kaminsky's use of a voice amplification device to help him speak and did not feel comfortable having Kaminsky interact with clients because he used this auxiliary aid.

117.    Defendant terminated Kaminsky's employment because he was an older worker with cancer.

118.    Defendant terminated Kaminsky in retaliation for his use of a voice amplification device for his disability.

119.    Kaminsky's cancer constitutes a *per se* disability under the MHRA.

120.    Kaminsky's cancer also constitutes a disability under the MHRA and ADA because it substantially impaired major life activities when viewed in its unmitigated state including communication and speaking and substantially limited the functioning of a major bodily system.

121.    Kaminsky was qualified for his position.

122.    Kaminsky was able to perform the essential duties of his position with or without reasonable accommodation.

123.    The Defendant's stated reasons for terminating Plaintiff are pretexts.

124.    The timing of the termination evidences disability discrimination and age discrimination.

125.    The animus of Defendant's managers evidences disability discrimination and age discrimination.

126.    On information and belief, Defendant billed and received reimbursement from the federal government for the GSA project at issue in Kaminsky's May 6, 2014 email.

127.    Defendant defrauded the federal government by billing it for services that were not in compliance with the federal government's requirements.

128.    Kaminsky's email to Tillotson and others on May 6, 2014 constituted a protected report for purposes of the MWPA and FCA.

16

129.     Defendant violated the FCA by retaliating against Kaminsky for opposing what he believed to be deviations from the GSA's requirements and by taking actions that could reasonably lead to a viable FCA action.

130.     Defendant terminated Kaminsky for reporting what he reasonably believed to be violations of law and practices that could endanger the health and safety of the public.

131.     Defendant violated the MWPA as enforced through the MHRA when it terminated Kaminsky.

132.     The timing of Kaminsky's termination within eight days of his protected activity, the shifting reasons offered for Kaminsky's termination, Defendant's after-the-fact rationalizations, and other circumstances establish that Kaminsky's protected activity was a factor in his termination that made a difference.

133.     Defendant had and continues to have a need for Kaminsky's work to be performed after Kaminsky was terminated.

134.     Defendant knowingly and willfully violated Kaminsky's rights.

135.     Defendant unlawfully discriminated against Kaminsky with malice or with reckless indifference to his rights.

136.     As a result of Defendant's actions, Kaminsky has suffered lost wages, lost benefits, loss of enjoyment of life, loss of self-esteem, injury to reputation, injury to career, humiliation, and other pecuniary and non-pecuniary losses.

137.     Kaminsky has no plain, adequate or complete remedy at law to fully redress the wrongs alleged, and he will continue to suffer irreparable harm from his treatment by Defendant unless and until Defendant is enjoined by this Court.

## COUNT I: MHRA – DISABILITY DISCRIMINATION

138.    Paragraphs 1-137 are incorporated by reference.

139.    Defendant's conduct constitutes unlawful disability discrimination against Plaintiff in violation of the MHRA.

## COUNT II: MHRA -  AGE DISCRIMINATION

140.    Paragraphs 1-139 are incorporated by reference.

141.    Defendant's conduct constitutes unlawful age discrimination against Plaintiff in violation of the MHRA.

## COUNT III: MHRA – RETALIATION

142.    Paragraphs 1-141 are incorporated by reference.

143.    Defendant's conduct constitutes unlawful retaliation against Plaintiff for opposing what Plaintiff reasonably believed to be violations of the disability and age discrimination provisions of the MHRA.

144.    Defendant's conduct constitutes unlawful retaliation against Plaintiff for using an auxiliary aid and needing reasonable accommodation for his disability.

## COUNT IV: MWPA– RETALIATION

145.    Paragraphs 1-144 are incorporated by reference.

146.    Defendant's conduct constitutes unlawful retaliation against Plaintiff for purposes of the MWPA as it is enforced through the MHRA.

## COUNT V: ADEA: AGE DISCRIMINATION

147.    Paragraphs 1-146 are incorporated by reference.

148.    Defendant's conduct constitutes unlawful age discrimination against Plaintiff in violation of the ADEA.

## COUNT VI: ADEA: RETALIATION

149.    Paragraphs 1-148 are incorporated by reference.

150.    Defendant's conduct constitutes unlawful retaliation against Plaintiff for opposing what Plaintiff reasonably believed to be violations of the ADEA.

## COUNT VII: ADA: DISABILITY DISCRIMINATION

151.    Paragraphs 1-150 are incorporated by reference.

152.    Defendant's conduct constitutes unlawful disability discrimination against Plaintiff in violation of the ADEA.

## COUNT VIII: ADA – RETALIATION

153.    Paragraphs 1-152 are incorporated by reference.

154.    Defendant's conduct constitutes unlawful retaliation against Plaintiff for opposing what Plaintiff reasonably believed to be violations of the ADA.

155.    Defendant's conduct constitutes unlawful retaliation against Plaintiff for using an auxiliary aid and needing reasonable accommodation for his disability.

## COUNT IX: FCA

156.    Paragraphs 1-155 are incorporated by reference.

157.    Defendant's conduct constitutes unlawful retaliation against Plaintiff for purposes of the FCA.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

(a)    Declare the conduct engaged in by Defendant to be in violation of his rights;

(b)    Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate Plaintiff's rights and the rights of other employees;

(c)     Order Defendant to employ Plaintiff in his former position and/or order Defendant to pay ongoing lost wages to Plaintiff;

(d)     Award equitable relief for back pay, benefits and prejudgment interest;

(e)     Award compensatory damages in an amount to be determined at trial;

(f)     Award punitive damages in an amount to be determined at trial;

(g)     Award liquidated damages in an amount to be determined at trial;

(h)     Award nominal damages;

(i)     Award attorney's fees, including legal expenses, and costs;

(j)     Award prejudgment interest;

(k)     Permanently enjoin Defendant from engaging in employment practices that discriminate on the basis of age and disability;

(l)     Require Defendant's President to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate discrimination or retaliation in the future;

(m)     Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

(n)     Require that Defendant train all employees on the protections afforded by state and federal anti-discrimination laws and whistleblower protection laws; and

(o)     Grant to Plaintiff such other and further relief as may be just and proper.

Dated:  05/12/15                              /s/ Chad T. Hansen
                                             chansen@maineemployeerights.com

                                             /s/ Peter L. Thompson
                                             pthompson@maineemployeerights.com


                                             Attorneys for the Plaintiff

                                             MAINE EMPLOYEE RIGHTS GROUP
                                             92 Exchange Street 2nd floor
                                             Portland, Maine 04101
                                             Tel. (207) 874-0905
                                             Fax (207) 874-0343